# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

| | |
|---|---|
| ENVIRONMENTAL SPECIALISTS, INC., ) | |
| Plaintiff, ) | |
| v. ) | No. 04-0098-CV-W-DW |
| ) | |
| NORTH AMERICAN SPECIALTY INSURANCE CO., ) | |
| Defendant. | |

**ORDER**

Before the Court are Plaintiff's motion for summary judgment (Doc. No. 44) and Defendant's motion for summary judgment (Doc. No. 101). It is well-established that summary judgment will be granted only when there is no genuine issue of material fact. FED. R. CIV. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986). Here, the parties go to great lengths to dispute virtually every fact in the case. Indeed, in its suggestions in opposition (Doc. No. 102), Defendant alleges that all of Plaintiff's undisputed facts (thirty-eight in all) are controverted by the evidence. Suffice it to say, there is a dispute of material facts. For that reason, the Court denies the dueling motions for summary judgment.

Legal issues, however, must be resolved by this Court before the case can be presented to a fact-finding jury. In order to address those issues, it is necessary for the Court to layout the *general* facts of the case. The Court does so fully cognizant that numerous specific facts and details of the parties' dealings are still very much in dispute.

I.

In 2002, Environmental Specialists Incorporated (ESI) entered into a construction contract with the Corps of Engineers, whereby ESI agreed to operate as general contractor on a project termed

the Quindaro Levee Project. ESI contracted with Banderas Construction to act as subcontractor on the Quindaro Project. Pursuant to the subcontract, Banderas acquired performance and payment bonds from North American Specialty Insurance (NAS), and Banderas was named the principal and ESI the obligee. The terms of the payment bond obligated NAS, as surety, to pay the necessary labor, material and equipment costs should Banderas be unable to make payment.

At some point during construction on Quindaro, Banderas failed to pay several suppliers for the labor and materials they provided on the project. Five suppliers allegedly sought payment from ESI, the general contractor, who paid the suppliers after conferring with NAS. Thereafter, ESI allegedly received assignments from the five suppliers to seek reimbursement from NAS. Other suppliers not paid by Banderas were subsequently paid by NAS.

In 2003, ESI made demand upon NAS for reimbursement of the monies that it had paid to the five suppliers. NAS refused the demand, claiming that it was entitled to payments that ESI owed to Banderas for work the subcontractor had done on the Quindaro Project. ESI countered that NAS was not entitled to payment under the subcontract because no money was owed Banderas. According to ESI, Banderas owed ESI payment under a separate project, the Blue River Project, and under the terms of the Quindaro subcontract, ESI had the right to setoff the Blue River debt against amounts earned by Banderas on the Quindaro Project.[1] Once this right of setoff is exercised, ESI contends no monies are owed to Banderas or NAS the surety.

In the instant lawsuit, ESI claims that it holds valid assignments entitling it to payment by NAS under the payment bond. ESI also claims that NAS' failure to pay constitutes a vexatious

---

[1] In the Blue River Project, the roles of ESI and Banderas were reversed – Banderas was the general contractor and ESI was the subcontractor. The amount of money, if any, that Banderas owes ESI under the Blue River Project is in dispute.

2

refusal. NAS defends that ESI's assignments are invalid. NAS also counters that ESI owes it, as surety for Banderas, the contract retainages kept by ESI under the Quindaro Project. Additionally, NAS argues that ESI's sureties for the Quindaro Project, American Home Assurance Company (AHAC) and St. Paul Fire & Marine Insurance Company, are liable under the Miller Act, 40 U.S.C. § 3131.

II.

Two legal issues can and must be resolved by the Court before the case goes to trial. First, it must be determined whether ESI holds a contractual right of setoff, and whether that right is trumped by any rights held by NAS. Second, the Court must decide whether the assignments that ESI allegedly obtained from the five suppliers are valid. Each issue will be addressed in turn.

A. Right of Setoff

Paragraph 8.10 of the Quindaro Project subcontract entered into by ESI and Banderas reads in pertinent part:

> Notwithstanding anything herein to the contrary, Contractor [ESI] has the absolute right to withhold and set off from funds otherwise due Subcontractor [Banderas] on this Project any amounts due Contractor from Subcontractor on any other project and, if Contractor exercises such right of set off, then Subcontractor hereby waives any lien claims and bond rights on this Project as to such amounts so set off.

A plain reading of this paragraph makes clear the following: The general contractor, here ESI, has a right to withhold monies owed to the subcontractor if the subcontractor owes the general contractor on a separate project. Further, the general contractor's right to withhold monies in this manner is "absolute" and not qualified by any other provision of the subcontract. Thus, the Court finds that paragraph 8.10 gives the general contractor an unrestricted right of setoff.

Applying paragraph 8.10 to the facts at hand, ESI contends that it had the right to withhold

3

payments from Banderas for work the subcontractor did on the Quindaro Project, because Banderas owed ESI on the Blue River Project. ESI argues that by withholding payment it simply exercised its contractual right of setoff.

To counter this point, NAS argues that it holds an equitable right of subrogation that trumps any contractual right of setoff that ESI may have. NAS explains that equitable subrogation is "[t]he substitution of one party for another whose debt the party pays, entitling the paying party to rights, remedies or securities that would otherwise belong to the debtor." NAS Sug. in Opp. at p.17 (quoting BLACK'S LAW DICTIONARY 1440 (7th ed. 1999)). Under this doctrine, NAS maintains that it stepped into the shoes of Banderas when it paid several of the defaulting subcontractors' suppliers and, as a result, can now lay claim to the monies due the defaulting subcontractor on the Quindaro Project. According to NAS, its subrogated right to the contract retainages is superior to ESI's right of setoff.

In United States v. Munsey Trust Co., 332 U.S. 234, 236 (1947), the Supreme Court addressed the issue of "whether percentages retained pursuant to contract by the United States may be subjected to its set-off claims despite the claims of a surety who has paid laborers and materialmen." In the case, the government entered into contracts with a contractor to perform work on certain federal buildings. The contracts were secured by two types of bonds: a performance bond (ensuring completion of the projects) and a payment bond (ensuring payment of those furnishing labor and material). Though it completed the work, the contractor was not paid by the government and the contractor failed to make payment to its suppliers, thus forcing the surety to pay the suppliers pursuant to the payment bond. The surety, then, claimed that it held a subrogated right to the contract retainage held by the government. The government, however, refused the surety's claim citing its right to setoff the contract retainage against monies owed the government by the contractor

under a separate unbonded project.

Addressing the surety's claim of subrogation versus the Government's right of setoff, the Supreme Court stated that "[t]he government has the same right which belongs to every creditor, to apply the unappropriated moneys of his debtor, in his hands, in extinguishment of the debts due to him." Id. at 239 (citations omitted). This right of setoff was superior to any subrogation right that might be held by the surety. Id. at 240. See also Miller-Stauch Constr, Co. v. Williams-Bungart Elec., 959 S.W. 2d 490 (Mo. App. 1998) (relying on Munsey for the proposition that "the obligee may have a right of set-off against the surety under a payment bond").

In view of Munsey, ESI's right of setoff would appear to be superior to any subrogation rights held by the surety. When it paid Banderas' suppliers, NAS acquired the rights that Banderas could have claimed had it not defaulted, as limited as those rights are. 332 U.S. at 242 ("[I]t is elementary that one cannot acquire by subrogation what another whose rights he claims did not have....One who rests on subrogation stands in the place of one whose claim he has paid, as if the payment giving rise to the subrogation had not been made.") Banderas' right to the contract retainages was subject to ESI's contractual right of setoff. See ¶ 8.10 of Subcontract. So it follows that NAS' subrogated right to the contract retainages was also subject to ESI's right of setoff. Munsey, 332 U.S. 234. For these reasons, and given the prevailing case law on the subject, the Court finds that ESI's right of setoff trumps any right of subrogation that NAS may possess.[2]

---

[2]NAS urges the Court to limit Munsey to the narrow facts of the case and find that the holding applies only where the federal government is a party. However, as explained in Munsey, the federal government's right of setoff is "the same right that belongs *to every creditor*." Id. at 239. The holding, therefore, is equally applicable to cases like this where the bond obligee is a non-governmental entity.

NAS also attacks Munsey on the ground that it has been partially overruled by Pearlman v. Reliance Ins. Co., 371 U.S. 132 (1962). To the contrary, the Court in Pearlman buttressed the Munsey

5

As a fallback, NAS argues that ESI did not have a right to setoff the contract retainages because Banderas was never entitled to ownership of the funds. The argument goes that under the General Indemnity Agreements (GIAs) signed by Banderas and NAS, and paragraph 8.7 of the Quindaro subcontract, Banderas was obliged to pay its suppliers with any monies it earned on the Quindaro Project prior to using the monies to satisfy other debts. Because Banderas did not pay its suppliers, the subcontractor never gained ownership of any funds from the Project. And because Banderas never had ownership of funds earned on Quindaro, ESI could not setoff those funds to pay Banderas' Blue River debt.

There is no merit to NAS' argument. Neither the GIAs nor paragraph 8.7 of the subcontract affect ESI's right of setoff. The GIAs were entered into by Banderas and NAS – ESI was not a signatory to the agreements. Further, the subcontract's paragraph 8.7 restricts the subcontractor's (Banderas) handling of earned funds but does not apply to the general contractor (ESI).[3]

In sum, the Court holds that ESI, as general contractor, had a contractual right of setoff; that the right is absolute and not qualified by any other provision in the subcontract; and that the setoff

---

holding explaining that the case stood for the "well-established common-law right of debtors to offset claims of their own against their creditors." 371 U.S. at 140. Pearlman did nothing to overrule or limit Munsey. See Federal Ins. Co. v. Maine Yankee Atomic Power Co., 183 F. Supp. 2d 76, 87 n.17 (D. Me. 2001) (comparing the Munsey and Pearlman holdings).

[3]Paragraph 8.7 states:

The Subcontractor agrees that monies received for the performance of this Subcontract shall be used first for payment of labor, material, equipment, supplies, and services entering into this work, and said monies shall not be diverted to satisfy obligations of the Subcontractor on other contracts until all obligations under or in connection with the Subcontract are satisfied in full.

The paragraph establishes what the subcontractor (Banderas) must do with earned monies but sets no restrictions on the manner in which the general contractor (ESI) pays the subcontractor. Further, paragraph 8.10 expressly makes ESI's setoff right absolute "[n]otwithstanding anything herein to the contrary."

right is superior to NAS' right of subrogation. The exact amount that ESI was entitled to setoff is a factual issue for the jury.

## B. Validity of Assignments

ESI seeks a reimbursement from NAS of the amounts that it paid to the five suppliers who provided work on the project. ESI claims that it acquired written assignments of rights from the suppliers. NAS argues that the written assignments are invalid because at the time they were executed the suppliers had nothing to assign. After Banderas failed to make payment, ESI paid the five suppliers in June of 2003 but did not acquire the written assignments until September of that year. According to NAS, at the time the written assignments were drafted (some three months after the suppliers were paid), the suppliers no longer held any rights against Banderas or NAS. Thus, the written assignments are worthless.

An assignment is accomplished when there appears from the circumstances an intention on one side to assign at present time and on the other side to receive. Miller v. Dannie Gilder, Inc., 966 S.W.2d 397, 398 (Mo. App. 1998) (citing Barker v. Danner, 903 S.W.2d 950, 956 (Mo. App. 1995)). It would be a legal impossibility for a party to assign a right that he does not have when the assignment is executed. See id. The September written assignments therefore are invalid – at the time of their execution the suppliers (the assignors) held no rights to assign. What rights the suppliers held were extinguished when ESI compensated them in June.

However, the fact that the alleged written assignments are invalid does not mean that ESI did not receive valid assignments from the suppliers. Indeed, the September "assignments" may serve as proof of valid oral assignments executed in June. In June, when the suppliers were paid, the suppliers still held their rights against Banderas and NAS; thus, by paying these suppliers, ESI may

7

have acquired assignments against NAS through oral agreements. The evidence may prove that such occurred, or it may not.

In any event, and assuming that valid oral assignments do not exist, ESI may nevertheless hold assignments by equity. An equitable assignment occurs when there is (1) an intention to assign, (2) assent to receive and (3) consideration. State ex rel. United Ind. Corp. v. Mummert, 878 S.W.2d 494, 497 (Mo. App. 1994). ESI makes the argument that it holds an equitable assignment, but the Court refrains from deciding the issue because the facts are in dispute.

To summarize, the Court finds that alleged written assignments signed in September are invalid. At the time they were signed, the assignors had no rights to assign. However, ESI may still hold valid assignments by way of oral agreement or equity.

### III.

For the foregoing reasons, the motions for summary judgment are denied.

IT IS SO ORDERED.

/s/ DEAN WHIPPLE
Dean Whipple
United States District Court

Date: June 1, 2005